FILED

2010 May-21  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL DENOON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 08-S-01883-NE** |
| | ) | |
| **THE CITY OF HUNTSVILLE,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael DeNoon, asserts claims for race discrimination and retaliation in violation of 42 U.S.C. § 1981, and for violation of the Equal Protection Clause of the Fourteenth Amendment, all pursuant to 42 U.S.C. § 1983, as well as additional claims for race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[1]  The action presently is before the court on the motion for summary judgment filed by defendants, the City of Huntsville, Alabama, the City's Police Chief, Henry Reyes, and former Police Chief and Director of Public Safety, Rex Reynolds.[2]

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should

---

[1] *See* doc. no. 20 (amended complaint) (hereafter, "Amended Complaint").

[2] *See* doc. no. 33.

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue

---

[3] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  STATEMENT OF FACTS

Plaintiff, Michael DeNoon, is a Caucasian ("white") male who has served as a police officer for the City of Huntsville, Alabama since March 1998.[4]  In January of 2009, he was promoted to sergeant.[5]  Plaintiff, nevertheless, contends that he was repeatedly discriminated against on the basis of his race prior to that promotion:  *i.e.*, when he was not promoted to sergeant in connection with two previous vacancies in July of 2007; when he was not assigned to the Special Weapons and Tactics ("SWAT") Team later that same year; and, when he was not promoted to a third sergeant position in August of 2007.[6]

---

[4] *See* Amended Complaint, ¶ 5; doc. no. 35 (vol. 1 of defendants' exhibits in support of motion for summary judgment ("MSJ"), Ex. 1 (Depo. of Michael Riley DeNoon) (hereafter, "Plaintiff Depo."), at 7 and 11-12.

[5] Plaintiff Depo. at 13-14.

[6] *See* Amended Complaint, ¶¶ 27, 38, 41, 45, 46, 48, 58, 61, 66, 70, and 74.  Plaintiff's Amended Complaint also purports to state a claim arising out of his non-selection for sergeant during 2008, but at his deposition, plaintiff admitted he did not intend to assert such a claim.  *Compare id.*

When evaluating these claims, this court did not write upon a blank slate. Instead, a related action, based upon a common nucleus of operative facts, was commenced just three days before this one by another white male officer in the City of Huntsville Police Department.   That case, styled *Michael Danley v. City of Huntsville*, *et al.*, and assigned Civil Action No. 2:08-CV-01855-AKK, was assigned to U.S. District Judge Abdul K. Kallon.   Even so, the parties in both actions have been represented by the same attorneys.   Moreover, joint discovery was conducted in both cases.   Consequently, the opinion of Judge Kallon, rejecting the claims of Michael Danley, has been carefully reviewed by this court when evaluating the same claims asserted by the plaintiff in this action.   A copy of Judge Kallon's opinion is attached to this opinion as "Appendix I"[7] and, for convenience, will be referred to in this opinion by the shorthand phrase "*Danley* Opinion."

A.   **Procedure for Sergeant Promotion**

Huntsville follows specified procedures for filling sergeant vacancies.   First, the Human Resources Department ("Human Resources") creates a list of eligible candidates. [Doc. 36-5, Aff. of City of Huntsville Senior Human Resources Analyst Tenya Woods (hereafter, "Woods Aff.")] at ¶ 2.   To do so, Human Resources posts a job announcement, commonly referred to as a "blue sheet," which details the qualification requirements. *Id.* During the 2006 to 2008 period at issue,

_____

¶¶ 55, 66, and 70 *with* Plaintiff Depo. at 211.

[7] *See also* doc. no. 49 in *Danley v. City of Huntsville*, Civil Action No. 2:08-CV-01855-AKK, slip op. (N.D. Ala. Apr. 30, 2010).

candidates needed the following qualifications: high school graduate; sixty semester hours or ninety quarter hours of course work at an accredited college or university; five years service as a sworn and bonded police officer, of which the previous eighteen months had to be continuous service with Huntsville; and a score of 70% on a written police supervisor examination. *Id*. at ¶ 3.

Candidates meeting these minimum requirements move into the second phase, in which a third-party consultant company scores them based on a written evaluation and an oral examination of supervisory and leadership abilities. *Id*. at ¶ 4. Human Resources then compiles a list of eligible candidates, ranking them by their following combined scores: written police supervisor examination (20%), written evaluation of supervisory and leadership abilities (40%), and oral examination of supervisory and leadership abilities (40%). *Id*. Applicants are notified only of their own personal combined score. *Id*. at ¶ 5. The list remains in effect for a year, which runs from the date the Chief of Police ("Chief") first requests a short list of eligible candidates. *Id*.

When the Chief notifies Human Resources of a vacancy, Human Resources provides a short list of eligible candidates. *Id*. at ¶ 6. If there is only one vacancy, the Chief receives the names of the three highest-ranking individuals; he receives an additional name for each additional vacancy. *Id*. Human Resources lists the candidates alphabetically and does not provide the Chief with the candidates' numerical rankings. *Id*. However, since the list remains in effect for a year, the Chief and others may deduce the rankings based on which candidates make the short list of three candidates. Doc. [35]-3, Reyes Dep. 31:2-33:6.

The Chief has the sole discretion to select any individual from the short list. Doc. [36-5], Woods Aff. ¶ 7. In making his selection, he may review the candidates' personnel files, consult with their supervisors, and interview them using questions approved by Huntsville's Equal Employment Officer. *Id*.[8]

---

[8] *Danley* Opinion at 3-5.

**B.     July 2, 2007 Sergeant Promotions**

The 2006 promotional listing became effective on September 19, 2006.[9]  Based

on his test scores and those of his fellow officers, plaintiff determined he ranked first

on the listing.[10]   Defendant Rex Reynolds, who was Chief of Police at the time,

promoted DeWayne McCarver (a Caucasian, or "white," male) on November 6, 2006,

and Larry Childress (white male) on January 15, 2007.[11]  Plaintiff was a candidate for

at least one of these promotions, but was not chosen for promotion.[12]  Following the

promotions, Reynolds called plaintiff, informed him that he was not selected, but told

him that he was "promotable."[13]

> In May 2007, two more sergeant vacancies arose, for which
> Human Resources provided [defendant Henry] Reyes [who replaced Rex
> Reynold as Police Chief in February of 2007] a list of four eligible
> candidates: [Michael Danley, the plaintiff in the related action assigned
> to Judge Kallon (white)], Michael DeNoon ("DeNoon") [the plaintiff in
> the present action (also white)], Corey Harris ("Harris") (African-
> American), and Robert Ramsey ("Ramsey") (African-American). Doc.
> [36-5], Woods Aff. ¶¶ 9-10.   Human Resources simply provided
> additional names from the 2006 promotional listing for these vacancies

---

[9] *See* doc. no. 36 (vol. 2 of defendants' exhibits in support of MSJ), Ex. 8 (Aff. of Tenya Woods) (hereafter, "Woods Aff."), ¶ 9.

[10] *See* doc. no. 36 (vol. 2 of defendants' exhibits in support of MSJ), Ex. 9 (Aff. of Deloise Manning) (hereafter, "Manning Aff."), Ex. F, at 12-13.

[11] *See* Woods Aff. ¶ 9.

[12] Manning Aff., Ex. F at 11-12; doc. no. 35 (vol. 1 of defendants' exhibits in support of MSJ), Ex. 2 (Depo. of Rex Reynolds) (hereafter, "Reynolds Depo."), at 17-18.

[13] Reynolds Depo. at 27.

6

since it was still in effect. *Id.* at ¶ 9.[14]

Of the four candidates, Corey Harris had the most education (a bachelor's degree and partial completion of a master's); Robert Ramsey had a bachelor's degree; Michael Danley had three years of college; and plaintiff had the least education (an associate's degree).[15] Ramsey had the most law enforcement experience (eighteen years), followed by Harris (fourteen years), plaintiff (nine years), and Danley (seven years).[16] Overall, plaintiff had received fewer awards and commendations than either Ramsey or Harris, but he did have a cleaner disciplinary record than Ramsey.[17]

Reyes asked a number of supervisors, including sergeants, lieutenants, captains, and a deputy chief, for their comments on the candidates, including the best candidates for promotion. [Reyes Aff.] at ¶ 6, Ex. B. He factored their responses in his decision. Doc. [35]-3, Reyes. Dep. 105:21-107:23. Of the four sergeant candidates, [Danley] received the fewest votes of support (one) compared to fifteen for Harris and fourteen for Ramsey. Doc. 38-2, Reyes Aff., Ex. A.[18]

Plaintiff received the second fewest number of positive statements from the ranking

---

[14] *Danley* Opinion at 5-6 (footnote omitted).

[15] *See* Reyes Depo. at 93-94; doc. no. 36 (vol. 2 of defendants' exhibits in support of MSJ), Ex. 5 (Aff. of Henry Reyes) (hereafter, "Reyes Aff."), at Ex. A.

[16] *See* Reyes Aff. at Ex. A.

[17] *See id.*

[18] *Danley* Opinion at 6-7 (footnote omitted). As noted in the omitted footnote, "[p]laintiff and defendants hotly contest whether the supervisors' comments were a major or minor factor. This court discusses the issue at length in its analysis. . . . A fair reading of the evidence establishes that Reyes considered the comments as at least one factor." *Id.* at 6 n.3.

supervisors (three).[19]   Indeed, the supervisors' comments regarding plaintiff were overwhelmingly negative.[20]   A total of eight out of the fifteen supervisors consulted by Chief Reyes spoke negatively of plaintiff.[21]   Chief Reyes testified that he was told that plaintiff had a "bad attitude," was a "loose cannon," was "anti-administration," and was a "complainer."[22]   Reyes's interview notes reflect that supervisors characterized plaintiff as having, among other negative traits:   "problems with supervisors"; an "attitude problem"; a "bad attitude"; and a "contentious," "abrasive" demeanor.   Some supervisors said he was:   a "constant complainer";"anti-department"; and, a "bad example."[23]   One said that plaintiff "thinks too much of himself, [is] not a follower," and "no one likes him."[24]   Even Lieutenant Juan Joyner — a superior officer with whom plaintiff felt "close" — informed Chief Reyes that plaintiff had "problems with supervisors."[25]

Chief Reyes ultimately promoted the two African-American candidates, Ramsey and Harris, to sergeant.[26]   Plaintiff thereafter exercised his right under the

---

[19] *See* Reyes Aff. at Ex. A.

[20] *See id.* ¶ 7.

[21] Reyes Aff. ¶ 7; Reyes Depo. at 232.

[22] Reyes Depo. at 227; Reyes Aff. at Ex. A.

[23] Reyes Aff. ¶ 8 and Ex. B.

[24] Reyes Aff. ¶ 8 and Ex. B.

[25] Reyes Aff., Ex. B, at D000500.  *See also* Plaintiff Depo. at 19.

[26] *See* Reyes Depo. at 108.

8

City of Huntsville's Personnel Policies and Procedures Manual to file a grievance contesting the decisions, alleging that "the department consistently ignored the results of the process they put in place to give them the best candidate for the position, and promoted their friends and minorities," and also asserting that he was "by-passed by candidates who were ranked four and five positions below [him] . . . because they were African American."[27]

## C.    August 27, 2007 Sergeant Promotional Decision

In July 2007, another sergeant vacancy arose, and Human Resources forwarded Reyes a list of three names from the 2006 promotional listing: Michael Danley, the plaintiff in the related action; Michael DeNoon, the plaintiff in the present action; and Joseph Jenkins ("Jenkins").[28] Jenkins's supervisors described him as an "outstanding leader," a "great leader," a "go-getter," and said that Reyes "could do no wrong with that type of person."[29] Reyes selected Jenkins for the promotion on August 27, 2008,[30] and later testified that the negative supervisory comments about plaintiff obtained during the previous round of promotions continued to deter him from promoting plaintiff.[31]

---

[27] Manning Aff. ¶¶ 2 and 3; Plaintiff Depo. at Ex. 1.

[28] *See* Woods Aff. ¶¶ 9-10.

[29] Reyes Depo. 125-126.

[30] Woods Aff. ¶ 9.

[31] *See* Reyes Depo. at 232 and 235-36; Reyes Aff. ¶ 9.

9

The day after Jenkins's promotion, plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination with respect to the promotional decisions on July 2, 2007, and retaliation with respect to the promotional decision on August 27, 2007.[32]

## D.    The SWAT Team Decision

On August 15, 2007, Deputy Chief Mark Hudson announced a Special Weapons and Tactics team ("SWAT") vacancy to all sworn personnel, at the request of Captain Rodney Baker, the Commander of the Special Operations Division of the Police Department (which includes the SWAT Team).[33]  The SWAT Team performs a number of high-risk operations, including hostage and barricaded-suspect response, executive protection, search and rescue, execution of dangerous felony-search and arrest warrants, and civil disturbance response.[34]  Officers who serve on the SWAT Team do so in addition to their regular duties, and SWAT Team service is considered a special assignment, not a promotion.[35]

Deputy Chief Hudson received responses from seven officers, including

---

[32] *See* Plaintiff Depo. at Exs. 4 and 5.

[33] *See* doc. no. 36 (vol. 2 of defendants' exhibits in support of MSJ), Ex. 6 (Aff. of Mark Hudson) (hereafter, "Hudson Aff."), ¶ 3 and Ex. A thereto; and Ex. 7 (Aff. of Rodney Baker) (hereafter, "Baker Aff."), ¶ 2;

[34] *See* Baker Aff. ¶ 2.

[35] *See* Hudson Aff. ¶ 2.

plaintiff.[36]  Although plaintiff initially received a supervisory recommendation for the position, he ultimately was disqualified from SWAT Team service under the City of Huntsville's anti-nepotism policy, because his brother was already a SWAT Team member.[37]  Section 5.6 of the City of Huntsville Personnel Policies and Procedures Manual provides that siblings cannot work within two levels of supervision of one another without a waiver from both the Director of Human Resources and the Mayor.[38]  All persons serving on the SWAT Team are directly supervised by the same supervisor and, thus, work not only within the same two levels of supervision, but within the same line of supervision.[39]

Deputy Chief Hudson believed that Captain Baker was the appropriate person to determine whether to seek a waiver, because he was intimately familiar with the operations of the SWAT Team; consequently, Hudson asked Baker to make the determination.[40]  After consideration of the issue, Captain Baker decided not to seek a waiver because of the nature of the SWAT Team's work.[41]  Captain Baker ultimately determined that, because the Team specializes in confronting and diffusing

---

[36] *See* Hudson Aff. ¶ 4.

[37] *See id.*

[38] *See id.* ¶ 5 and Ex. B.

[39] *See id.* at ¶ 5; Baker Aff., ¶ 4.

[40] *See* Hudson Aff. ¶ 6.

[41] *See* Baker Aff. ¶¶ 4-5.

11

highly dangerous situations, having two brothers on the team could present a serious risk of rank-breaking in volatile circumstances, a situation that could result in the endangerment of other team members.[42]   Captain Baker and Deputy Chief Hudson both attested that, to their knowledge, no siblings have ever been allowed to serve together on the SWAT Team.[43]

Moreover, there is no evidence indicating that, at the time this decision was made, either Baker or Hudson had any knowledge of any grievance or EEOC charge filed by plaintiff, and neither had spoken with Chief Reyes about the issue.[44]   Chief Reyes testified that he and his secretary were the only individuals inside the Police Department who were aware of the grievance and EEOC charge filed by plaintiff.[45]

After Captain Baker made his decision against seeking a waiver, he presented it to Chief Reyes, who agreed.[46]   Chief Reyes testified that "[w]e've had incidents where officers have been shot and killed in SWAT situations, [so he concluded] that it would not be a good idea" for two brothers to serve concurrently on the SWAT

---

[42] *See id.* ¶ 5.

[43] *See id.* ¶ 11; Hudson Aff. ¶ 12.

[44] *See* Baker Aff. ¶¶ 5 and 7; Hudson Aff. ¶¶ 6 and 8.   Plaintiff makes the unsupported assertion in his brief that Baker remarked about plaintiff's grievance at some point "later," but this assertion, even if true, does not amount to "substantial evidence" that Baker possessed knowledge of the grievance at the time of the disputed decision.   Plaintiff's Brief at 34 n.18.   Regardless, Baker's knowledge or lack thereof is not dispositive.   *See* discussion of plaintiff's retaliation claims, *supra*.

[45] *See* Reyes Depo. at 131-32 and 135.

[46] *See id.* at 154-55; Baker Aff. ¶ 5.

Team.[47]  Rex Reynolds, who was serving as Public Safety Director at the time, was also consulted on the waiver issue, but deferred to Baker's decision.[48]

Plaintiff filed another EEOC charge on October 23, 2007, alleging retaliation as a result of his disqualification from assignment to the SWAT Team.[49] Subsequently, on October 31, 2007, Deputy Chief Hudson was made aware for the first time that two sets of brothers — Dan and Joseph Dean, and DeWayne and Alex McCarver — were, in fact, serving together on another special operations unit, the Mobile Field Force ("MFF").[50]  The MFF is a unit organized to provide rapid response to the scene of a civil disorder, where the objective is to quickly gain control and minimize potential harm to the community.[51]  The MFF is primarily designed to control or move crowds, and is not designed specifically to address situations involving hostile gunfire.  In fact, if gunfire occurs during the course of an MFF assignment, the MFF will retreat and request SWAT Team assistance.[52]  The placement of officers on the MFF is not a formal process, and the decisions are not

---

[47] Reyes Depo. at 153-54.

[48] *See* doc. no. 36 (vol. 2 of defendants' exhibits in support of MSJ), Ex. 4 (Aff. of Rex Reynolds) (hereafter, "Reynolds Aff."), ¶ 3.

[49] *See* Amended Complaint ¶ 12

[50] *See* Hudson Aff. ¶ 9; Reyes Depo. at 157.

[51] *See* Baker Aff.  ¶ 8.

[52] *See id.*

13

as carefully screened as the placement of officers on the SWAT Team.[53]  Moreover, the Police Department often cannot persuade a sufficient number of officers to join the MFF voluntarily.[54]   Consequently, officers are often conscripted into MFF service.[55] Even so, on the same day that Deputy Chief Hudson became aware of the two sets of brothers in MFF service, he contacted Captain Baker and, by the end of the day, Dan Dean and Alex McCarver agreed to terminate their service on the MFF in order to allow their brothers to continue their assignments.[56] Chief Reyes testified that there was no difference between the MFF and the SWAT team in terms of the application of the anti-nepotism policy.[57]

### E.    The Resolution of Plaintiff's Grievance

On August 7, 2007, the City's Director of Human Resources denied the grievance plaintiff had filed on July 27, 2007, challenging the Harris and Ramsey promotions.[58]  Plaintiff appealed, and the City's Personnel Committee conducted a hearing on January 23, 2008.[59]  Counsel for plaintiff and for the City of Huntsville

---

[53] *See* Hudson Aff. ¶ 11.

[54] *See id.*

[55] *See id.*

[56] *See* Hudson Aff. ¶ 9; Baker Aff. ¶ 9.

[57] *See* Reyes Depo. at 156-57.

[58] *See* Manning Aff. ¶ 4 and Ex. C.

[59] *See id.* ¶ 5, Ex. D, and Ex. F.

14

presented evidence, called witnesses, and made opening and closing statements.[60]

The Personnel Committee concluded that "there was no evidence presented to support

[plaintiff's] grievance."[61]  Plaintiff did not appeal the decision to the City Council,

even though he had a right to do so.[62]

**F.     Statements by City Officials and in The Huntsville Times**

As Judge Kallon observed in his opinion addressing the claims of Michael

Danley in the related action growing out of the same nucleus of operative facts,

former Police Chief Rex Reynolds had conversations with City Councilman Richard

Showers ("Showers") and Madison County Commissioner Bob Harrison.  Both men

are African-American, and both expressed a need for more minority representation

in leadership roles within the fire and police departments.

> One such discussion took place at a February 2007 meeting, also
> attended by Mayor [Loretta] Spencer and City Council President Glen
> Watson.  *Id*. at 35:4-11.  Additionally, at a work session in December
> 2008, Showers expressed his opinion that the departments had missed
> opportunities to promote minorities.  *Id*. at 82:3-86:5.

> The Huntsville Times covered a promotional ceremony for the
> police and fire departments in July 2007.  Doc. [35]-3, Reyes Dep., Pl.
> Ex. 2.  The published article, entitled "Minorities move up fire, police
> ladders," stated in relevant part:

---

[60] *See id.* at Ex. F.

[61] Manning Aff. at Ex. E.

[62] *See id.* ¶ 8.

Police officers and Robert Ramsey and Corey Harris, both of whom are black, were promoted to sergeant.

Public Safety Director Rex Reynolds said he has tried to recruit more minorities to public safety and promote more minorities into management positions. He said community leaders have been patient during those efforts, which Reynolds said are paying off.

"They are not minority promotions," Reynolds said about Thursday's ceremony. "They are the most qualified for the promotions."

*Danley* Opinion at 15-16 (record citation omitted).

## III. DISCUSSION

In this action, as in the related case commenced by Michael Danley, plaintiff's Amended Complaint contains five claims: Count I (disparate-treatment race-discrimination claim under 42 U.S.C. §§ 1981 and 1983); Count II (disparate-treatment race-discrimination claim under Title VII); Count III (retaliation claim under Title VII); Count IV (retaliation claim under 42 U.S.C. §§ 1981 and 1983); and Count V (disparate-treatment race-discrimination claim under the Fourteen Amendment and 42 U.S.C. § 1983).[63] Laying aside slight differences between the

---

[63] *See* Amended Complaint. Unlike the plaintiff in *Danley*, plaintiff here alleged Counts I and IV against *all* defendants, rather than solely against the City Huntsville. *See id.* However, this difference requires no new analysis because, as applied to the additional defendants, the analysis of Count I (discrimination under §§ 1981 and 1983) is duplicative of Count II (discrimination under Title VII) and the analysis of Count IV (retaliation under §§ 1981 and 1983) is duplicative of Count III (retaliation under Title VII). *See* footnote 65, *infra*. *See also Adams v. Cobb County School Dist.*, 242 Fed. Appx. 616, 620 n.6 (11th Cir. 2007) ("We note that 'whether the elements of Title VII and § 1981 retaliation claims are the same is an "open question" in this Circuit.' . . . But because neither

qualifications of the plaintiff here and Michael Danley in the related action, which are not sufficient to alter the analysis, the facts asserted and arguments raised in support of each plaintiff's disparate-treatment claims are identical in both cases.[64] Consequently, after careful consideration of the record in this case, the court adopts the conclusions reached by Judge Kallon in his opinion analyzing the evidence and issues in Michael Danley's related case, and also concludes that defendants did not discriminate in the July 2, 2007 promotional decisions, and that the City of Huntsville did not have a policy of discrimination.  Accordingly, Michael DeNoon's disparate-treatment claims (Counts I, II, and V) are due to be dismissed against all defendants.[65] Furthermore, plaintiff's retaliation claims (Counts III and IV) are due to be dismissed because plaintiff failed to provide substantial evidence of pretext.

## A.    Plaintiff Does Not Present Evidence of Material Issues of Disputed Fact

---

party has raised the issue, we will assume . . . that the elements of Title VII retaliation and § 1981 retaliation are the same.") (quoting *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1120 n.10 (11th Cir. 2001)).  Counts II and III were asserted against all defendants and fully analyzed in *Danley*.

[64] Among the four candidates, Danley and DeNoon were the least educated (three years of college and two years, respectively) and had the fewest years of experience (seven years and nine years, respectively). Both only had one disciplinary action on file, and DeNoon had significantly fewer awards and commendations than Danley (seven and twenty, respectively).

[65] "Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under  [the Equal Protection Clause and] sections 1981 and 1983, the legal elements of the claims are identical ... [and] we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims."  *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir.1985) (emphasis added).  *See also Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (holding that the legal elements of disparate treatment claims under Title VII and under the Equal Protection Clause and § 1983 are identical).

**Sufficient to Survive Summary Judgment on His Disparate-Treatment Claims (Counts I, II, and V).**

Plaintiff does not claim to have direct evidence of race-based discriminatory animus on the part of defendants.  Accordingly, he must prove his claim with circumstantial evidence, navigating the burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and then elaborated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  *Cf. Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 141-42 (2000).

Under that now-familiar analytical framework, plaintiff must first establish a *prima facie* case of intentional discrimination on the basis of plaintiff's race.  Establishment of the *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against him on the basis of a protected characteristic.  If plaintiff establishes a *prima facie* case of discrimination, the defendant employer then must articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If the employer is silent in the face of the presumption created by the demonstration of a *prima facie* case, the court must enter judgment for the plaintiff, because no issue of fact remains in the case.  On the other hand, if the defendant articulates one or more legitimate, non-discriminatory reasons

18

for its decision, the presumption of discrimination created by the demonstration of a *prima facie* case is eliminated, and plaintiff then has both the obligation and the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision, but simply a pretext for an unlawful, discriminatory animus. If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding the credibility of each of the defendant employer's articulated reasons, the employer is entitled to summary judgment on the plaintiff's claim. *See*, *e.g.*, *Burdine*, 450 U.S. at 254; *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir.2000) (*en banc*); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

In a failure to promote case, the plaintiff must establish the following elements of a *prima facie* case: (1) he is a member of a protected group; (2) he applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) despite his qualifications, he was rejected for the position; and (4) after his rejection, the employer *either* kept the position open, *or* filled it with a person outside plaintiff's protected class. *See*, *e.g.*, *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of

19

the relative qualification of the person promoted instead of plaintiff as part of her

*prima facie* case for failure to promote); *Crawford v. Western Electric Company, Inc.*,

614 F.2d 1300, 1315 (5th Cir. 1980).[66]

Because plaintiff was ranked in the top three on the 2006 promotional list, and

also was told by former Police Chief Rex Reynolds that he was "promotable," the

court will assume for the sake of the following discussion that plaintiff was qualified

for a sergeant position.  No other element of the *prima facie* case was challenged.

> As legitimate, non-discriminatory reasons, defendants proffer two
> reasons for Reyes' decision not to promote plaintiff:  (1) lack of support
> from supervisors, and (2) negative remarks about plaintiff from
> supervisors. . . .   Specifically, defendants note that when Reyes
> canvassed the supervisors for their opinions as to the top two candidates,
> fifteen people recommended Harris, fourteen recommended Ramsey,
> [and only three recommended plaintiff].

*Danley* Opinion at 21.  Moreover, the supervisors used such terms as "loose cannon,"

"anti-administration," "bad attitude," and "complainer" when describing plaintiff.[67]

One supervisor opined that plaintiff "thinks too much of himself, [is] not a follower,"

and said that "no one likes him."[68]  "Defendants have thus satisfied their burden of

presenting legitimate, non-discriminatory reasons." *Danley* Opinion at 22.

---

[66]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[67] Reyes Depo. at 227; Reyes Aff. at Ex. A.

[68] Reyes Aff. ¶ 8 and Ex. B.

Once an employer offers a legitimate, non-discriminatory reason for the failure to promote, the plaintiff "must meet the reason proffered head on and rebut it . . . .  If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citations omitted).  As the Eleventh Circuit has often emphasized:

> Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal law] does not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.'

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  The court "must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (citations and internal quotation marks omitted).

*Danley* Opinion at 22-23 (footnote omitted).[69]

Plaintiff raises numerous arguments, also raised by the plaintiff in *Danley*, to

---

[69] As noted in the omitted footnote, plaintiff argues that employment discrimination cases involving a pretext inquiry "are only infrequently resolved on summary judgment."  Plaintiff's Brief at 19-20 (quoting *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1332 (M.D. Ala. 2000)).  The Eleventh Circuit, however, rejected this presumption in *Chapman*: "The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  229 F.3d at 1026. *See also Danley* Opinion at 23 n.14.

rebut the two reasons proffered by defendants — all of which fall short of establishing pretext. First, with respect to his negative supervisory evaluations, plaintiff argues that there is conflicting evidence on the weight Chief Reyes actually accorded the supervisors' recommendations and comments.[70] Judge Kallon rejected this same argument in the *Danley* case, when observing:

> However, the deposition exchange plaintiff cites, (doc. [35]-3, Reyes Dep. 105:21-107:23), indicates unequivocally that Reyes considered the candidates' overall qualifications and, within that analysis, placed some importance on the recommendations and comments received from the candidates' supervisors. Notably, the supervisors' comments, including the tally of support, appear in Reyes' contemporaneous interview notes and on the matrix he developed to compare the four candidates, clearly establishing that he considered them in making his decision. Doc. 38-2, Reyes Aff., Exs. A, B. While plaintiff seeks to create an issue of fact with respect to the weight afforded to these recommendations, there is no evidence in the record that Reyes did not consider the comments or felt that they were unimportant. Moreover, when pushed in his deposition to assign a specific weight to them, he stated that he looked at the "overall picture of everything, but I would probably put more weight on them than the overall because of the fact they had specific experience with those officers." Doc. [35]-3, Reyes Dep. 107:8-12. Additionally, Reynolds testified that, when Reyes came to him with his recommendations, he reviewed Reyes' matrix and with respect to the supervisors' comments stated: "And this is something I've asked the chief on multiple occasions on various issues is, you know, tell me what your commanders are telling you because we rely heavily on what we receive from those commanders that work closer to those subordinates that we're reviewing for promotion." Doc. 37-2, Reynolds Dep. 16:11-18. In other words, there is no material conflict on the weight Reyes gave to the supervisors' opinions. To the contrary, the evidence presented indicates that the supervisors' opinions were one of the key

---

[70] Plaintiff's Brief at 23-26.

factors Reyes considered.

Critically, however, even if plaintiff is correct that they only played a minor role, his claim still fails.  Plaintiff has offered no evidence that (1) his supervisors did not actually make the negative comments, or (2) that he actually had significantly more support for his candidacy than indicated by Reyes' tally, in which only *one* person recommended him for the promotion.  *See, e.g., Chapman*, 220 F.3d at 1029 (plaintiff's pretext arguments did not address the specific concern raised by employer).  Even assuming, as the court does, that the comments were but one of several factors on which Reyes based his decision, plaintiff failed to establish that Reyes' reliance on them was pretext for unlawful discrimination.

*Danley* Opinion at 23-25 (footnote omitted).[71]  The same conclusion pertains in the present case.

"Plaintiff further argues that Reyes' failure to mention his lack of supervisory support during the administrative hearing or to him at the time of the promotion also suggests pretext. Doc. [no. 42 at 24-26].  First, this argument runs counter to the record." *Danley* Opinion at 25.  During the administrative hearing, Reyes was asked what his final decision was based upon, and he testified that, among other things, he

---

[71] The omitted footnote summarized Reyes's testimony on this point:

Reyes cited his reliance on the supervisors' opinions multiple times during his deposition. *See* Doc. [35]-3, Reyes Dep. 41:22 (noting that he talked to candidates' commanders), 87:7-9 (same), 99:11-22 (same), 109:2 (commenting on Ramsey's recommendations from his supervisors), 111:21-112:1 (same), 112:14-15 (commenting on Harris' recommendations from his supervisors), 113:16-22 (same). *See also* Doc. 38-2, Reyes Aff. ¶¶ 6,10 (discussing importance of supervisors' comments).

*Danley* Opinion at 23 n.15.

based it upon "supervisory input."[72]

> Second, with respect to plaintiff's argument that Reyes should have informed him that his candidacy lacked the support of his supervisors, plaintiff has offered no evidence that (1) he requested an explanation, (2) he received an inconsistent explanation, or (3) that it was common for unsuccessful candidates to receive a specific reason."

*Danley* Opinion at 25-26 (footnote omitted).[73]

Next, plaintiff contends that defendants' reasons are pretextual because he had a higher combined score than Ramsey and Harris, and more awards and fewer disciplinary actions than Ramsey.[74]

> As an initial matter, it is not this court's place to determine which candidate is most qualified.  *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) ("We do not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive.") (citation omitted)).

> With respect to plaintiff's argument that his higher test scores

---

[72] Manning Aff., Ex. F at 69-70.

[73] As noted in the omitted footnote:

Plaintiff cites to *Mock v. Bell Helicopter Textron, Inc.*, 196 Fed. Appx. 773 (11th Cir. 2006), for the proposition that Reyes' failure to tell plaintiff why he did not receive the promotion is sufficient to establish pretext.  In *Mock*, however, the plaintiff demanded an explanation for his termination, but his employer refused to give him one.  Plaintiff in this case has simply provided no evidence that he ever requested an explanation – much less that one was refused.  *See Smith v. Alltel Commc'ns, Inc.*, No. 8-393, 2009 U.S. Dist. Lexis 109071, at *31 n.17 (M.D. Ala. Nov. 3, 2009) (determining that *Mock* was inapposite because there was no evidence that the defendant refused to provide an explanation to the plaintiff).

*Danley* Opinion at 26 n.16.

[74] Plaintiff's Brief at 26-28.

demonstrate pretext, the Eleventh Circuit considered, and rejected, a nearly identical argument in *Denney*. In that case, white firefighters challenged the promotions of minority applicants who scored lower on a qualification exam. 247 F.3d 1172. Like here, the candidates received scores based on a written examination, skills assessment test, and interview. *Id*. at 1178. Candidates receiving at least seventy out of one hundred formed the pool of qualified applicants from which the Fire Chief could select a person for promotion, without regard to the applicants' scores. *Id*. The court rejected the plaintiffs' argument that the decision to promote lower-scoring black applicants above higher-scoring white applicants established pretext: "Under the Department's promotion policy, qualification exercise scores mattered only for purposes of determining the pool of qualified candidates. After that, *other* criteria were determinative." *Id.* at 1187 (emphasis in original).

Similarly, in this case, candidates needed certain qualifications, including a 70% on a police supervisor examination, to proceed to the portion of the interview process administered by a third party. Human Resources then ranked the candidates that proceeded to the final stage based on the combined scores of their police supervisor examination, and the oral and written evaluations administered by the third party. As in *Denney*, Reyes received the names of the three top candidates each time a sergeant vacancy arose, listed alphabetically and without their numerical rankings. Reyes was free to select any of the candidates based on his assessment of their suitability for the sergeant position. Thus, *Denney* is dispositive – the rankings here simply established the pool of qualified candidates, and did not prevent Reyes from looking at other factors or qualities when making the final promotion decision.

*Danley* Opinion at 26-28.

Moreover, as in the *Danley* case, the present plaintiff argues that "he had a

better record with respect to awards and discipline than Ramsey, . . . [Yet,] his

evidence 'does not demonstrate that he was so much more qualified than [Ramsey]

that a reasonable jury, on this record, could infer discrimination from the mere fact of his non-selection.'" *Danley* Opinion at 28 (quoting *Denney*, 247 F.3d at 1188). Ramsey's personnel records reflected a total of six disciplinary actions (including three one-day suspensions), whereas plaintiff had only one.[75] Even so, Chief Reyes testified that Ramsey had *no* disciplinary actions in the five years preceding the promotion decision.[76] Moreover, plaintiff's assertion that he "had significantly more awards and commendations than Officer Ramsey" is completely unsupported.[77] The evidence before the court indicates that Ramsey had more awards and commendations than plaintiff (eighteen *versus* plaintiff's fourteen).[78] Further, Ramsey had more law enforcement experience (eighteen years *versus* plaintiff's nine), more education (a bachelor's degree *versus* plaintiff's associate's degree), and slightly higher evaluation scores — all of which provide "an honest explanation" for Reyes's decision to select Ramsey.[79] *Chapman*, 229 F.3d at 1030.  Consequently, as in the *Danley* case, so here: *i.d.*, "the differences in Ramsey's and plaintiff's qualifications are not sufficient to establish a material issue of disputed fact or show pretext.  In fact, on this record, it is hard to see how plaintiff can contend that he is more qualified than Ramsey."

---

[75] Reyes Aff. at Ex. A.

[76] *See* Reyes Depo. at 110.

[77] Plaintiff's Brief at 28.

[78] *See* Reyes Aff. at Ex. A.

[79] *See id.*

26

*Danley* Opinion at 28-29.

Finally, the present plaintiff — like his fellow officer, Michael Danley — seeks to establish pretext by suggesting that the City had an affirmative action plan to promote minorities.  Like Danley, this plaintiff

> points out that, in 2007, certain members of Huntsville's City Council pressured Reynolds and Reyes to promote more African-American officers.  Doc. [42 at 20-23].  In February 2007, Reynolds held a meeting with Showers, who wanted to discuss minority recruitment and promotion.  Doc. 37-2, Reynolds Dep. 35:4-36:17.  Reynolds asked Mayor [Loretta] Spencer and City Council President Glen Watson to sit in.  *Id.*  Reynolds testified that he consistently responded that he was not "going to point and choose minorities to fill positions over other people that were more qualified."  *Id*. at 36:1-3.  Plaintiff also points to an article published in The Huntsville Times on police and fire promotions, including the Harris and Ramsey promotions, to show pretext.  Doc. [35]-3, Reyes Dep., Pl. Ex. 2.
>
> In *Denney* [*v. City of Albany*, 247 F.3d 1172 (11th Cir. 2001),] the plaintiffs cited to the city's affirmative action as evidence of pretext.  The Eleventh Circuit noted that "[c]ourts have been extremely wary of citing lawful affirmative action plans as evidence of an employer's pretext" and concluded that the city's plan, which expressly stated that selecting officials should make promotion decisions without regard to race, failed to establish pretext.  247 F.3d at 1188 (further noting that there was no evidence that the city considered the city's affirmative action plan in making the challenged promotions).  *Cf. Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095 (11th Cir. 2001) (affirmative action plan indicated pretext when other factors were also present: (1) candidate selected did not meet minimum job qualifications, (2) managers were told that failure to meet affirmative action goals could "affect their future as managers," (3) division chief informed the plaintiff that the county would continue to promote on the basis of color, and (4) hiring process deviated from standard procedure).

This case is more factually similar to *Denney* than *Bass*. Here, defendants presented Huntsville Police Department's Written Directive No. 309-2, which states: "Promotional processes will not discriminate based on race, color, creed, religion, national origin, sex, age, political affiliation, marital status or handicap . . . ." Doc. 38-11, Thomas Aff., Ex. A. Showers' criticism of the low rate of minority promotions and Reynolds' statements to The Huntsville Times do not establish that Reyes disregarded the department's equal opportunity policy or unlawfully considered race in making the promotions. In fact, Reynolds' statement to the newspaper stated the opposite, *i.e.* that these were promotions of the most qualified rather than minority promotions. Significantly, unlike *Bass*, plaintiff provides no evidence that Reyes deviated from standard hiring procedures or that Reyes and Reynolds articulated a decision to promote based on race, regardless of a candidate's qualifications.

*Danley* Opinion at 29-31 (footnotes omitted).[80]

In light of the foregoing conclusions, the court finds that plaintiff has failed to

---

[80] The omitted footnotes state:

Plaintiff also points to meetings that took place in December 2008 in which Showers expressed his opinion that the fire and police departments had missed opportunities to promote African-Americans. Doc. 37-2, Reynolds Dep. 82:3-86:5. First, these meetings occurred approximately a year and six months after the promotion and therefore had no bearing on Reyes' decision in June 2007. Second, Reynolds' testimony does not support plaintiff's arguments – at the December 2008 meetings, Reyes and Reynolds defended decisions *not* to promote black candidates because they considered the white candidates more qualified.

and

Reynolds also testified that in a work session of the City Council on minority recruitment he told Showers that "he could see, if he would be patient, we had African-Americans and other minorities getting the correct experience, the education and qualifications necessary to be promoted." Doc. 37-2, Reynolds Dep. 34:2-8.

*Danley* Opinion at 29 n.18 and n.19.

establish that defendants' legitimate reasons for failing to promote him were pretextual and, therefore, plaintiff's race discrimination claims (Counts I, II, and V) must fail.[81]

**B.    Plaintiff Does Not Present Evidence of Material Issues of Disputed Fact Sufficient to Survive Summary Judgment on His Retaliation Claims.**

In the remaining counts, III and IV, plaintiff claims, under Title VII and § 1983 respectively, that defendants retaliated against him by failing to promote him to sergeant on August 27, 2007, and by failing to assign him to the SWAT Team in September of 2007.

When, as here, the plaintiff seeks to establish his retaliation claims through

---

[81] Additionally, under § 1983, municipalities, such as the City of Huntsville,

cannot be held liable on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). Thus, a municipality is liable under section 1983 only 'when execution of a government's policy or custom . . . inflicts the injury.' *Id.* at 694.

Plaintiff asserts that Reynolds' statements to the Huntsville Times regarding attempts to "recruit more minorities to public safety and promote more minorities into management positions" demonstrates a policy or custom of "[f]avoring one racial group for employment over another." Doc. [42 at 37]; Doc. [35]-3, Reyes. Dep., Pl. Ex. 2. This court disagrees. Not only does the article fail to establish that Huntsville maintained a policy or custom of discrimination or retaliation, producing a single newspaper article, without more, is simply insufficient to maintain plaintiff's burden on summary judgment. *See Weller v. Ransom-Garner*, 338 Fed. Appx. 249, 252-53 (3d Cir. 2009) (newspaper articles on problems with Department of Human Services failed to establish policy or custom of failing to protect foster children) . . . .

*Danley* Opinion at 17. Plaintiff's failure to prove that Huntsville had instituted a discriminatory policy operates an alternative ground for dismissal of his § 1983 claims against the city.

29

circumstantial evidence, courts employ the burden-shifting analysis articulated in

*McDonnell Douglas*, 411 U.S. 792.[82]  *Hairston v. Gainesville Sun Publishing Co.*, 9

F.3d 913, 919 (11th Cir. 1993).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer  a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000)

(citations omitted).

A plaintiff generally must prove three elements to establish a *prima facie* case

of retaliation:  (1) that he engaged in statutorily protected expression;[83] (2) he suffered

an adverse employment action; and (3) there was a causal linkage between the

protected conduct and the adverse employment action.  *See*, *e.g.*, *Shannon v.*

*BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002). Even

assuming for the sake of argument that plaintiff has proven a *prima facie* case of

---

[82]The court applies the same analysis to Counts III and V since retaliation claims under Title VII and section 1983 "generally have the same elements of proof and use the same analytical framework." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). Indeed, the parties adopted this approach in their briefs.  *See* Doc 36 at 48 n.11; Doc. 45 at 41.

[83] "Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

retaliation, he still failed to demonstrate that defendants' legitimate, nonretaliatory reasons for the employment decisions were pretextual under the *McDonnell Douglas* burden-shifting analysis.[84]

Here, defendants assert the lack of supervisory support for plaintiff's candidacy as the legitimate, nondiscriminatory reason for the August 27, 2007 promotion of Jenkins over plaintiff.[85]

> With respect to Jenkins' promotion, Reyes testified that he considered Jenkins' evaluations, role as a canine officer, and supervisors' comments, which were: "Outstanding leader . . . could do not wrong with that type of person. He's a go-getter . . . wants to make sure he does things right so, you know, [he] would be a great leader."

*Danley* Opinion at 37 (quoting Reyes Depo. at 125-126). In response, plaintiff simply "adopts the analysis set forth in the discussion of his discrimination claim."[86] Because plaintiff relies on pretext arguments that have already been discussed and rejected by not only this court, but also Judge Kallon in the *Danley* case, there is no basis for finding that the proffered reason for the August 27, 2007 promotional

---

[84] The *Danley* court specifically found that Danley proved a *prima facie* case of retaliation, relying in part on the large number of promotions and assignments he was denied, after his discrimination complaint, as evidence of a causal relationship between the discrimination and the adverse actions. *Danley* Opinion at 35-36. The facts are less compelling in this case because plaintiff was only denied one promotion and one special assignment. The court, however, will assume for the sake of this discussion that plaintiff proved his *prima facie* case and will resolve the retaliation claims on the basis of plaintiff's pretextual arguments, as the *Danley* court did.

[85] *See* doc. no. 34 (defendant's brief in support of their motion for summary judgment) (hereafter, "Defendants' Brief"), at 42.

[86] Plaintiff's Brief at 34.

decision was pretextual.[87]

The decision to deny plaintiff membership in the SWAT Team, then, is the only decision remaining to be discussed.  Defendants assert that plaintiff was disqualified from service under the City of Huntsville's anti-nepotism policy, due to the fact that plaintiff's brother was already a SWAT Team member.  All evidence indicates that no siblings have ever served together on the SWAT Team.  In rebuttal, plaintiff contends that waivers have been granted to allow several other sets of brothers to serve on another special forces team, the Mobile Field Force ("MFF"); and, consequently, that a waiver would have been granted here, but for retaliatory intent. Ultimately, however, the MFF and the SWAT Team are not comparable units within the police department; thus, it does not follow that waivers in the context of the MFF provide substantial evidence that a waiver would have been granted in the present case, absent a retaliatory motive.  The risks posed by siblings serving together on the SWAT Team are significantly higher than the risks posed by siblings serving on the MFF.  The SWAT Team is thrust into dangerous situations involving hostile gunfire,

---

[87] The court recognizes that the qualifications of plaintiff might compare more favorably to the qualifications of Jenkins than they did to the qualifications of Ramsey or Harris. Plaintiff, however, failed to provide the court with any comparative analysis whatsoever, much less "demonstrate that he was so much more qualified than [Jenkins] that a reasonable jury, on this record, could infer discrimination from the mere fact of his non-selection.'" *Denney*, 247 F.3d at 1188.  Furthermore, the court finds that supervisory comments favoring Jenkins provide "an honest explanation" for Reyes' decision. *Chapman*, 229 F.3d at 1030.

while the MFF functions as a crowd-control unit at scenes of disorderly conduct.  If gunfire erupts, the MFF actually retreats and calls in the SWAT Team.

The decision not to waive the anti-nepotism policy in relation to SWAT Team membership was motivated by safety concerns.   If brothers serve together on the SWAT Team, the risk of both dying in a single firefight increases.  Furthermore, one brother might be tempted to break rank to assist his brother, to the detriment of the other team members.  Brothers serving in the MFF, on the other hand, are not typically placed in such dangerous situations.  Obviously, the purpose of an anti-nepotism policy is not officer safety; yet, nothing in the policy prevents officer safety from being considered when deciding whether the policy should be *waived*.  Plaintiff failed to rebut the proffered legitimate safety concerns and prove that they were pretextual.  Plaintiff's retaliation claims (Counts III and IV), therefore, must fail.

In light of the fact that all of plaintiff's claims have been foreclosed on the aforementioned bases, the remaining arguments raised by defendant in support of its motion need not be reached.

### IV.  CONCLUSION AND ORDER

In accordance with the foregoing, defendants' motion is GRANTED, and plaintiff's claims are dismissed with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 21st day of May, 2010.

_____
United States District Judge

# APPENDIX  I

FILED

2010 Apr-30 PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL DANLEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:08-cv-01855-AKK** |
| **CITY OF HUNTSVILLE,** | ) | |
| **HENRY REYES, and REX** | ) | |
| **REYNOLDS,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Before the court is Defendants' Motion for Summary Judgment, (doc. 35),
filed pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth in
the accompanying Memorandum Opinion, the court hereby GRANTS the motion
and DISMISSES plaintiff's claims with prejudice.

DONE this 30th day of April, 2010.


**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE